KARSTEN, Appellant, v. ROOT, Respondent.

(153 N. W. 932.)

(File No. 3736.   Opinion filed August 25, 1915.)

1. **Appeals—Error—Briefs—Assignments of Error, Absence of—Reference From Specifications to Settled Record, to Statement of Case—Court Rule.**

Objections to specifcations of error, that those embodied in the settled record are all that appear in the abstract and brief, and that there is no reference in the abstract to the corresponding specifications of error in settled record, as required by Rule 5 (140 N. W. viii) of Supreme Court, are well taken; and assignments of error based upon rulings of trial court in admission or exclusion of answers to isolated questions set out in brief without reference to where such questions can be found in statement of case, or in what connection they were asked, whether such question is contained in statement of case or not, will not be considered.

2. **Damages—Measure of—Sales—Sales in Violation of Contract—Profits—Sales by Assistant Furnished by Principal—Instructions.**

In a suit for purchase price of pianos sold to defendant, under a contract giving him exclusive right to resell them in certain territory, and providing for furnishing by the principal to the agent of an expert salesman who was to receive a comsion from the agent on sales effected by him, the defendant alleging, as counterclaim, that the principal sold pianos in such territory in violation of the agreement, and to prospective purchasers of defendant, **held** that an instruction that defendant was entitled to the profits on all pianos so sold in said territory, whether sold through defendant or by his principal, was not erroneous as stating an improper rule of damages; the salesman so furnished to defendant having assisted in making such sales, and the contract providing that defendant was to pay for his services through certain sales commissions.

3. **Same—Loss of Profits as—Remoteness.**

Loss of profits may constitute an element of damages, where neither remote nor speculative, and being based upon actual sales of pianos made in whole or in part, by an agent, and were all made pursuant to a contract.

4. **Sales—Action for Price—Counterclaim for Profits on Sales—Exclusive Right of Resale—Termination of Contract—Question for Jury—Instruction.**

In a suit for purchase price of pianos sold to defendant under a contract giving him exclusive right of resale in certain territory, he counterclaiming for profits under sales by the dealer in violation of the contract, **held**, that, as the profits were limited to the sales made while the contract was in force, the question of termination of the contract was, under the evidence, one for the jury; and an instruction that, in view of a provision in the contract that it may be cancelled on notice in writing, it was in force until such time as the evidence showed such notice, was error; there being some evidence tending to show abandonment of the contract by the parties. Smith and Gates, J. J., dissenting.

Appeal from Circuit Court, Beadle County. Hon. ALVA E. TAYLOR, Judge.

Action by A. C. Karsten against D. O. Root, to recover for purchase price of pianos sold by plaintiff's assignor to defendant; defendant counterclaiming for profits on certain sales made by said assignor. From a judgment for defendant, and from an order denying a new trial, plaintiff appeals. Reversed.

*C. A. Kelley,* and *James Byrnes,* for Appellant.

*Null & Royhl,* for Respondents.

(1) Under point one of the opinion, Respondent cited: Supreme Court Rule 5; Hepner v. Wheatley, 144 N. W. 924 (S. D.); Duprel v. Collins, 146 N. W. 594 (S. D.)

(2) Under point two of the opinion, Appellant cited: American Building and Loan Assn. v. Hart et al., ('Wash.) 27 Pac. 468; Thompson on Trials, Vol. 3, p. 2328, Sec. 3442; W. G. Taylor Co. v. Bannerman et al., 97 N. W. 981, (Wis.) Thomson-Houston Electric Co. v. Berg, 30 S. W. 454 (Texas); Russell v. Horn Brannen and Forsyth Mfg. Co., 59 N. W. 901 (Neb.); Sadler, etc., Co. v. Hissborough Mills, 73 Am. St. Rep. 569 (N. H.); Cranmer v. Kohn et al., 46 N. W. 125 (S. D.)

Respondent cited: Richardson v. Chynoweth, 26 Wis. 656; Poposkey v. Munkwitz, (Wis.) 32 N. W. 35; Shadbolt v. Topliff, (Wis.) 55 N. W. 856; Shoemaker v. Heineman, 74 N. W. 785; Cloe v. Rogers, (Okla.) 38 L. R. A. (N. S.) 366; Wakeman v. Wheeler & W. Mfg. Co., 101 N. Y. 205, 54 Am. Rep. 676, 4 N. E. 264; Emerson v. Pacific Coast & N. Packing Company, (Minn.), 1 L. R. A. (N. S.) 445.

[4] Under point four of the opinion, Appellant cited: Manufacturers' Furnishing Co. v. Kremer et al., 64 N. W. 528 (S. D.); Encyclopedia of Evidence, Vol. 9, p. 495, Sec. 5; Cummons v. Arnold, 37 Am. Dec. 155 (Mass.); Mahon v. Leech et al., 90 N. W. 807 (N. D.); Wadge v. Kettelson, 97 N. W. 856 (N. D.); Cughan v. Larson et al., 100 N. W. 1088.

POLLEY, J.    Respondent, a dealer in musical instruments in Huron, in May, 1913, entered into a contract with the P. S. Wick Company, a manufacturer of pianos, whereby respondent was to handle the Wick pianos, stools, etc., and was given exclusive right to sell the same in certain described territory, which contract was to remain in force until terminated by written notice from either party.    The complaint alleges the sale and delivery of certain pianos to respondent by the said Wick Company, on which there is claimed to be a balance due of $579.95; and that, prior to the commencement of this action, the said account had been duly assigned and transferred to appellant.    Respondent admitted most of the items in the account, but by way

of affirmative defense and counterclaim alleged that, while said contract was in full force and effect, the appellant, in violation of the terms thereof, sold certain pianos (not less than 12 in number) within the territory described in the said contract, and to prospective purchasers of respondent. It is further alleged that said sales were made as the result of advertising done, at an expense of $150 or more, by respondent within said territory; that said Wick Company appropriated to its own use the profits on the sale of all of said pianos, as well as the benefit of respondent's advertising, all to respondent's damage in the sum of $750. The said contract provided, among other things, that respondent should have the assistance of an experienced salesman, who should receive as his compensation 10 per cent. of the gross amount of all retail sales made by him, together with his legitimate expenses, all of which was to be paid by respondent. The evidence showed that the average profit on a Wick piano was $50 or more. The jury returned a verdict for respondent, and from the judgment entered thereon and the order overruling a motion for a new trial, plaintiff appeals.

[1] At the outset, it is contended by respondent that appellant's brief contains no assignments of error, that the specifications of error embodied in the settled record are all that appear in the abstract and brief, and that there is no reference in the abstract to the corresponding specification of error in the settled record, as required by rule 5 (140 N. W. viii) of this court, nor does it state the page of the settled record where such specification is to be found. These objections are well taken, but the greater number of appellant's assignments are subject to a more serious criticism, and one that renders it impossible for this court to determine the correctness of the rulings that are made the basis of said assignments, even though we were to disregard the other defects in the record. These assignments are based upon the rulings of the trial court in the admission and exclusion of answers to certain isolated questions set out in the brief, without any reference to where the question can be found in the statement of the case, or in what connection the question was asked, whether such question is contained in the statement of the case on file in this court or not, and in some cases even failing to give the name of the witness to whom the question

was propounded, as, for instance, assignment No. 2:

"The court erred in sustaining defendant's objection, 'incompetent and immaterial and calling for a conclusion of the witness,' to the question: 'I will ask you to state whether or not the P. S. Wick Company has ever at any time received an order from the defendant, D. O. Root, for pianos under contract Exhibit N?' Page 3 of transcript and record."

The reference given at the end of the question is the page number of the transcript and settled record. But this is of no assistance whatever to us, because the transcript and settled record are not on file in this court. Whether the question was competent and material or not depends upon the immediate subject of the investigation at the time the question was put to the witness and the pertinency of the question to the issue that was being tried. This cannot be determined from the record before us. State v. Shepard, 30 S. D. 219, 138 N. W. 294; Peterson v. Miller, 33 S. D. 397, 146 N. W. 585.

[2] The trial court instructed the jury that, under the contract with the Wick Company, respondent was entitled to the profits on all of the Wick pianos that were sold within the territory described in the contract during the life of the contract, whether the same were sold through respondent or were sold directly by the Wick Company. This instruction was excepted to by appellant on the ground that it does not correctly state the rule as to the measure of damages in this class of cases. Without undertaking to determine what is the general rule as to the measure of damages in this class of cases, we believe that, when applied to the facts as disclosed by the record in this case, said instruction is correct. The contract provides that respondent was to accept and pay for the services of a capable salesman. Such salesman, in the person of one Ridenour, who appears to have been an expert at selling pianos, was furnished by said company. He was employed by said company to assist various parties who were handling the Wick pianos. It appears from the evidence that this party did assist in the making of all the sales that were made in respondent's territory, whether such sales were made through other parties or directly by the Wick Company. By the terms of the contract, respondent was entitled to what was left of the retail price of the pianos after paying the wholesale price to

the Wick Company, the commission to said special salesman, and such incidental expenses as may have been incurred in connection with the making of such sales. The undisputed evidence showed that the profits averaged more than $50 on each piano sold; and the evidence shows, with reasonable certainty, that not less than twelve pianos were disposed of by the Wick Company within said territory during the life of respondent's contract that were never accounted for to him. The loss of profits on these sales alone is sufficient, if allowable, to offset the whole of the claim purporting to have been assigned to appellant.

. [3] That loss of profits may constitute an element of damage is a well-settled rule of law. In this case, the profits were neither remote nor speculative. It is not a case where the making of the sales was prevented by some wrongful act on the part of one against whom the claim for damages is made. The sales were actually made, and all made, in part at least, through the efforts of respondent and the special salesman who had been assigned by the Wick Company to assist respondent, and the Wick Company should have accounted to respondent for what his profits would have amounted to under the terms of the contract. In Cranmer v. Kohn et al., 7 S. D. 247, 64 N. W. 125, this court announced the rule as follows:

"Profits in proper cases are recoverable when they are capable of being ascertained and made the basis of an intelligent verdict. Evidence of profits is not to be excluded simply because they are such"

—and quoted with approval the following from Sutherland on Damages:

" 'There are numerous cases, even for breach of contract, in which profits have been properly held to constitute not only an element, but the measure, of damages. When it is advisedly said that profits are uncertain and speculative, and cannot be recovered, when there is an alleged loss of them, it is not meant that profits are not recoverable merely because they are such, nor because profits are necessarily speculative, contingent, and too uncertain to be proved, but they are rejected when they are so; and it is probable that the inquiry for them has been generally proposed when it must end in fruitless uncertainty, and therefore it is more a general truth than a general principle that a loss of profits is

no ground on which damages can be given.' The decisions are not entirely in harmony as to the measure of damages in this class of cases, but we are of the opinion that the weight of authority is against the contention of respondent."

[4, 5] But the profits to which respondent is entitled must be limited to profits on pianos that were sold while the contract was actually in force, and, under the facts as they appear from the record in this case, the question of the termination of the contract should have been submitted to the jury. Upon this branch of the case, the court instructed the jury as follows:

"The contract provides that it may be canceled on notice in writing. Hence the contract was in full force and effect until such time as you shall find from the evidence that a written notice of cancellation was given by one of the parties to the contract to the other."

This instruction was excepted to on the ground that the contract could be canceled by mutual agreement, and that the evidence tends to show that the contract was canceled by mutual agreement and was abandoned by both parties. We believe the giving of this instruction was error. There was at least some evidence, both direct and circumstantial, tending to show that the contract had been abandoned by both parties prior to some of the sales upon which respondent is claiming commissions. The said Ridenour testified that, about the 25th of June, 1913, he had a conversation with respondent in regard to the cancellation of the contract, and that respondent told the witness that he could take the pianos and get out of the store, and that he would take the matter up with the house. Two days later, respondent wrote a letter to P. S. Wick in which he said:

"Ridenour has told me that my contract was to be canceled at once, and that he would remove the goods from my store. I have two deals pending here that will be closed, I think, after which I presume, as per his statement, he will create a new dealer here."

Respondent himself admitted that, after the writing of this letter, he ordered no more goods from the said company, and that nothing further was shipped to him by the said company except one piano and some piano stools that had previously been ordered,

and the sale of which constituted one of the deals mentioned in the said letter.

From these facts and circumstances, cancellation of the contract by mutual agreement or abandonment could be inferred; but when, if at all, such cancellation took place should have been determined by the jury. The giving of said instruction constituted error, for which a new trial must be had.

The judgment appealed from is reversed.

SMITH, J. (dissenting, GATES, J., concurring therein). I cannot concur in the view that the trial court erred in giving the instruction referred to in the majority opinion as to the cancellation of the contract. The evidence quoted in the majority opinion, I think, makes it plain that the only thought in the minds of the parties was that the P. S. Wick Company might possibly choose to exercise its right to cancel the contract, which it never did. If Ridenour had "created a new dealer here," as Root says he threatened to do, there might have been something on which to hang the theory of an "abandonment of the contract," but he never attempted to, nor did the company, create a new dealer to take Root's place. It must be remembered that under the contract Ridenour was Root's salesman—not the company's employee—and was working on a commission which was paid by Root. And at the very time of the row between Root and Ridenour the undisputed evidence shows that Root told Ridenour that if there was any cancellation of the contract, "the company would have to do it." And after this to the end of the dealings involved in this case the business ran along just as it had before the trouble. The trouble between Root and Ridenour arose over the fact that Ridenour was selling only the Wick pianos, and was in the habit of "knocking" other lines handled by Root. There was no trouble directly between Root and the company, although Root had complained to them that the salesman he had employed at their suggestion had been injuring his trade in other lines of pianos. It is perfectly plain that what the Wick Company wanted was to utilize the business standing and advertising facilities of Root as a dealer in that trade territory, and there is not a scrap of evidence that the company ever thought of abandoning the advantages which they had gained through the contract. The Wick Company got what

it bargained for, and to permit it to escape payment under some imaginary theory of abandonment would be little short of a miscarriage of justice.